815 F.2d 270
 55 USLW 2538, 1987-1 Trade Cases 67,499
 PENNSYLVANIA DENTAL ASSOCIATION; Delaware County Dental
Society; Erie County Dental Association, Inc.; Harrisburg
Area Dental Society; Luzerne County Dental Society;
Montgomery-Bucks Dental Society; Odontological Society of
Western Pennsylvania; Scranton Dental Society; and York
County Dental Society,
v.
MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA, d/b/a
Pennsylvania Blue Shield, Appellant,
v.
YORK COUNTY DENTAL SOCIETY, Fifth District Dental Society,
Dennis W. King, D.D.S., Charles M. Ludwig, D.D.S., Theodore
R. Paladino, D.D.S., Thomas L. Perkins, D.M.D., and Kay F.
Thompson, D.D.S., Third Party Counterclaim Defendants.
 No. 86-5338.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 20, 1987.
Decided March 30, 1987.
Rehearing and Rehearing In Banc Denied April 23, 1987.
 
 Thomas A. Beckley (argued), John G. Milakovic, Beckley & Madden, Harrisburg, Pa., Barry E. Carter, Washington, D.C., for appellees.
 Charles F. Scarlata, Pittsburgh, Pa., for Theodore R. Paladino, D.D.S.
 Joseph Friedman (argued), Stephen F. Ban, Michael J. Hennessy, Springer, Bush & Perry, P.C., Pittsburgh, Pa., William H. Wood, William E. Miller, Jr., Thomas E. Wood, Keefer, Wood, Allen & Rahal, Harrisburg, Pa., for appellant.
 Before GIBBONS, Chief Judge, WEIS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Medical Service Association of Pennsylvania, doing business as Pennsylvania Blue Shield (Blue Shield), appeals from a summary judgment in favor of ten dental associations and five individual dentists (collectively referred to as "the organized dentists")[1] dismissing Blue Shield's claims under section 4 and section 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26 (1982 & Supp. III 1985), as well as pendent state law claims. Blue Shield alleges that the organized dentists engaged in concerted activity in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982 & Supp. III 1985), by successfully exhorting Pennsylvania dentists to refuse to contract with Blue Shield to provide dental services to Blue Shield subscribers. The district court, 632 F.Supp. 653, granted the organized dentists' motion for summary judgment on the antitrust claims and dismissed Blue Shield's pendent state law claims without discussion.[2] We reverse.
 
 I.
 
 2
 Blue Shield is a non-profit health services insurance company incorporated under the Pennsylvania Health Services Plan Corporations statute. 40 Pa.Cons.Stat.Ann. Secs. 6301-6335 (Purdon 1986). It provides subscribers with prepaid medical, dental, and related health services. Blue Shield's dental coverage plan invites dentists to become participants by agreeing to accept reimbursement from Blue Shield for services rendered, but it limits such reimbursement to a percentile of the usual charges of dentists of a similar specialty. Blue Shield subscribers are permitted, under the plan, to use the services of non-participating dentists, but those dentists are free to charge patients the difference between what Blue Shield will pay and what they decide to charge. This practice is known as balance billing. The participating dentists undertake not to engage in that practice. Thus, the economic effect of becoming a participating dentist is to agree to sell services to Blue Shield for its subscribers at what in many cases will be a discount. The benefits of becoming a participating dentist are direct payment from Blue Shield and increased patronage from Blue Shield subscribers seeking to avoid balance billing.
 
 
 3
 To assure itself that insured and non-insured dental care prices are commensurable, Blue Shield requires dentists to submit to in-office reviews. These reviews of insured and non-insured patients' files take place at both participating and non-participating dentists' offices. Comparisons are made by Blue Shield for the purpose of determining standard dental service fees. Blue Shield also requires both participating and non-participating dentists to certify on claim forms that the charges are their most frequent charges.
 
 
 4
 Blue Shield sells its prepaid dental services plan on a group-only basis. It sold its first group plan in January of 1972. That plan met with initial market success. By the middle of 1974, Blue Shield had achieved the goal of having 70% of the state's dentists as participating dentists. About that time, however, Blue Shield began to encounter resistance from the organized dentists. Eventually, a large number of dentists withdrew from participation.
 
 II.
 
 5
 The summary judgment in this case does not present the problem of drawing inferences of conspiracy from circumstantial evidence. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The record contains an abundance of direct evidence of concerted action by the organized dentists intended to encourage Pennsylvania dentists to withdraw from or to avoid the status of Blue Shield participating dentists. That evidence includes: action by the Executive Board of the Erie County Dental Association, Inc., recommending that its members drop their participating dentist relationship; a resolution by the Erie County Dental Association membership opposing the concept of participating dentists and recommending that its members withdraw; publication by the Harrisburg Area Dental Society of its Dental Insurance Manual, which advocates a uniform and unified position by dentists in opposition to Blue Shield review of patient records for the purpose of determining commensurability of charges; a resolution by Fifth District Dental Society--which includes the Harrisburg Area Dental Society and other groups--that its membership should avoid contractual relationship with intermediaries like Blue Shield; a resolution by the Scranton District Dental Society that its members should not become participating dentists; and a resolution by the Luzerne County Dental Society requesting that its members become non-participants in the Blue Shield program.
 
 
 6
 There is also evidence that written pledges were circulated requiring undertakings by dentists to resign from participation. Various individual defendants, particularly Charles M. Ludwig, president-elect and later president of the Pennsylvania Dental Association, conducted individual meetings with dentists in which the dentists were urged to withdraw from participation. Moreover, officials of the Pennsylvania Dental Association met with Blue Shield representatives and informed Blue Shield that unless it modified the cost containment efforts to which the organized dentists objected, more resignations would take place. At the annual meeting of the Pennsylvania Dental Association House of Delegates, the Association's president expressed the hope that Blue Shield would yield. When Blue Shield did not yield, further departicipation resolutions were passed by other organized dental groups, including the York County Dental Society and the Montgomery-Bucks Dental Society. The Erie County Dental Association and the House of Delegates of the Pennsylvania Dental Association, organizations which had already passed departicipation resolutions, renewed them. Not surprisingly, there is ample direct evidence that all of the defendants acted in concert on the issue of departicipation to put maximum pressure on Blue Shield to yield on its cost containment program. There is also ample direct evidence that the Pennsylvania Dental Association advised dentists by letter that they should resist disclosure to Blue Shield of certain patient information sought by it in the course of in-house reviews.
 
 
 7
 Following the meetings at which departicipation resolutions were adopted, there were mass withdrawals of participation by dentists. The percentage of participating dentists statewide, as compared to all dentists who submitted claims to Blue Shield, declined from greater than 72% in 1974 to less than 54% in the early 1980s.
 
 
 8
 In 1978, following the decisions in National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), one of the defendants, the Harrisburg Area Dental Society, was advised by counsel with respect to the legality of its Dental Insurance Manual dealing with participation in third-party dental plans. Accordingly, the Harrisburg Area Dental Society passed a resolution suspending its previously adopted policy of departicipation. That suspension resolution was not distributed to all dentists, however, and no effort was made to nullify the effect of the previously obtained departicipation pledges. All of the remaining defendants which adopted departicipation resolutions still have such resolutions of record.
 
 
 9
 In 1977, the Pennsylvania Dental Association began to protest and challenge every filing Blue Shield made with the Pennsylvania Insurance or Health Departments affecting dental programs. It also initiated a number of court proceedings against Blue Shield. These legal maneuvers sought to establish that Blue Shield's in-house review and cost containment efforts were illegal interferences in the doctor-patient relationship. None of them proved to be successful.
 
 
 10
 Thus, unlike the more typical case under section 1 of the Sherman Act, 15 U.S.C. Sec. 1, in which concert of action must be inferred from a trail of circumstantial evidence left by conspirators intent on concealment, this case presents a summary judgment record abounding in direct, frequent, public, on-the-record evidence of improper concerted action. It is abundantly clear that the defendants' actions were aimed both at causing participating dentists to withdraw, and at preventing Blue Shield from obtaining the information it needs to determine whether the dentists' charges to it are commensurable with their charges to uninsured patients. The district court's grant of summary judgment could be proper, therefore, only if the activities referred to: 1) were legal under the Sherman Act; 2) caused no actual or threatened antitrust injury to Blue Shield's business or property; 3) were immune; or 4) are no longer actionable because of the applicable four-year statute of limitations. 15 U.S.C. Sec. 15b (1982). The organized dentists advance each of these contentions.
 
 III.
 
 11
 The district court concluded that the concerted action outlined above was legal under the Sherman Act. Rejecting Blue Shield's argument that the organized dentists' activities evidence a group boycott aimed at coercing it into abandoning its costs containment efforts, the district court opined:
 
 
 12
 The dentists did not have a dispute with Blue Shield, and Blue Shield was not the dentists' target. The dentists had a dispute with the notion of third-party control over dentists' otherwise independent decision-making and the target of their dispute was the participating dentist system. That Blue Shield had a stake in the dispute does not make it a target of a boycott.
 
 
 13
 This reasoning is both inconsistent with the summary judgment record and completely illogical. There is abundant evidence that the primary purpose of the departicipation movement was to coerce Blue Shield to yield on the issue of an upper limit on charges by participating dentists. The participating dentists were targets, but only in the sense that they were urged to become members of a boycott of Blue Shield's participant contract. Indeed, the participating dentists were the beneficiaries rather than the victims of the concerted action. Clearly, the target, in the sense of potential adverse economic effects, was Blue Shield.
 
 
 14
 The district court also concluded that, even assuming the activity complained of was construed to be a group boycott, it was nevertheless legal. This activity was not, the court reasoned, a per se violation of section 1; rather, under a rule of reason analysis, it was valid as a matter of law. In so ruling, the district court relied principally upon Indiana Federation of Dentists v. Federal Trade Commission, 745 F.2d 1124 (7th Cir.1984), which was subsequently reversed in Federal Trade Commission v. Indiana Federation of Dentists, --- U.S. ----, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). In Indiana Federation a dental association adopted a rule requiring its members to withhold x-rays from dental insurers in connection with evaluating patients' claims for benefits. The Federal Trade Commission, employing a rule of reason analysis, held that this concerted activity violated section 5 of the Federal Trade Commission Act, 15 U.S.C. Sec. 45 (1982 & Supp. III 1985), and section 1 of the Sherman Act, 15 U.S.C. Sec. 1, because it eliminated competition among individual dentists in dealing with third-party payers. The Court of Appeals for the Seventh Circuit vacated the Commission's cease and desist order on the ground that there was no evidence that the conduct of the dental association and its members had any effect on competition in the relevant market. The Supreme Court unanimously reversed. The Court rejected the dental federation's argument that the no x-ray policy had the non-economic purpose of assuring that patients receive the highest quality dental care possible. Justice White wrote:
 
 
 15
 Application of the Rule of Reason to these facts is not a matter of any great difficulty. The Federation's policy takes the form of a horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire--the forwarding of x-rays to insurance companies along with claim forms. "While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." Society of Professional Engineers, supra, 435 U.S. at 692, 98 S.Ct., at 1365. A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them. Absent some countervailing pro-competitive virtue--such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services, see Broadcast Music, Inc. v. CBS [441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)], supra; Chicago Board of Trade, [v. U.S., 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918)], supra; cf. NCAA v. Board of Regents of Univ. of Okla., 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)--such an agreement limiting consumer choice by impeding the "ordinary give and take of the market place," Society of Professional Engineers, supra, 435 U.S. at 692, 98 S.Ct., at 1365, cannot be sustained under the Rule of Reason. No credible argument has been advanced for the proposition that making it more costly for the insurers and patients who are the dentists' customers to obtain information needed for evaluating the dentists' diagnoses has any such procompetitive effect.
 
 
 16
 Indiana Federation, 106 S.Ct. at 2018.
 
 
 17
 The Supreme Court's unanimous decision in Indiana Federation requires that we reject the district court's rule of reason analysis. Clearly there is sufficient evidence in the summary judgment record to support a finding that under the rule of reason there was a violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1. Indeed, this is an a fortiori case. That being so, there is no reason to address the question of whether the court also erred in rejecting Blue Shield's argument that the evidence of group boycott activity should be regarded as a per se violation of section 1.
 
 IV.
 
 18
 The organized dentists urge that even if the evidence of record establishes a prima facie case of a Sherman Act violation, it is not one about which Blue Shield may complain. They point out that the Federal Trade Commission's standing to redress such violations is broader than that of private litigants--such as Blue Shield--which must satisfy the antitrust injury require- ments of section 4 and section 16 of the Clayton Act. 15 U.S.C. Secs. 15, 26; see also Cargill, Inc. v. Monfort of Colorado, Inc., --- U.S. ----, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).
 
 
 19
 The organized dentists do not seriously dispute that the concerted activities complained of resulted in wholesale withdrawals by participating dentists. Rather, they contend that these withdrawals did not injure Blue Shield in its business or property, and that, even if they did, the injury was not an antitrust injury for which sections 4 and 16 of the Clayton Act afford redress.
 
 
 20
 Affidavits on file contain evidence from which a factfinder could conclude that, in selling group dental insurance, the level of participation--i.e., the extent to which insured parties would be protected from balance billing--is a significant factor in choosing among competing plans. These affidavits document specific instances in which the low level of participation by dentists in the geographic region covered by the purchasing group was a material factor in Blue Shield's loss of the group business.[3] There is also on file the affidavit of Paul J. Feldstein, an economist, explaining the cross elasticity of demand among various payment provision plans for dental services. That affidavit outlines the effect of departicipation on the price of dental services. By refusing to agree to refrain from balance billing, the departicipants reduce Blue Shield's ability to compete in the prepayment market because they deny Blue Shield access to dentists who are willing to compete for business on the basis of price. Based on information of record with respect to sales, former and present levels of participation, the activities of other sellers of dental payment plans, and other relevant materials, Mr. Feldstein has made an estimate of the sales lost by Blue Shield as a result of the organized dentists' boycott, and of the resulting loss in net income. In his opinion, the activities of the organized dentists resulted in a participation rate 12.92 percentage points lower on average in each county of Pennsylvania than it would have been absent those activities. With regard to the organized dentists' resistance to in-office review, Mr. Feldstein expresses the opinion that Blue Shield's estimate of resultant damages in excess of $220,000 is a statistically valid and conservative measure of its losses from preventable overcharges.
 
 
 21
 The organized dentists levy a shotgun blast of arguments against Blue Shield's evidence of injury. Most of the pellets are not even close to the target. The pellet which perhaps comes closest to the mark is the objection that since Blue Shield's expert, Mr. Feldstein, was not listed in Blue Shield's pretrial order, his affidavit may not be considered. The organized dentists do not contend, however, that the pretrial order provided for preclusive effect with respect to materials which could be submitted in opposition to a motion for summary judgment. See In re Japanese Electronic Products, 723 F.2d 238, 255 (3d Cir.1983), rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, even absent the Feldstein affidavit, other affidavits contain evidence from which lost sales of group insurance business could be found.
 
 
 22
 In the alternative, the organized dentists contend that, even assuming lost sales and lost income, Blue Shield is not a proper antitrust plaintiff. This argument has two aspects. First, the dentists urge that, because Blue Shield lost sales, other sellers of dental prepayment plans must have gained sales; hence, the conspiracy was pro-competitive. Second, they urge that Blue Shield's injury was indirect and that only Blue Shield's subscribers should be recognized as having antitrust standing.
 
 
 23
 Neither of the organized dentists' arguments addresses the injury resulting from overcharges as a result of resistance to the in-house review program. Such overcharges did not help competitors of Blue Shield to sell group dental plans. The overcharges resulted from payments Blue Shield made on behalf of Blue Shield subscribers. This injury--i.e., the payment of overcharges as a result of a horizontal agreement to resist in-house reviews which were aimed at cost containment--is unquestionably an antitrust injury suffered by Blue Shield alone. No one else can possibly complain about it. It involves no chance of duplicate recovery, and requires no apportionment of damages. The causal connection between the horizontal agreement complained of and the overcharges is patent. Thus, the summary judgment cannot be affirmed on the theory that Blue Shield suffered no antitrust injury.
 
 
 24
 Furthermore, aside from the injury to Blue Shield resulting from overcharges, a factfinder could also conclude that Blue Shield suffered antitrust injury in the form of lost sales as a result of the organized dentists' resistance to participation. Antitrust injury is not limited to competitors of conspirators. Blue Shield of Virginia v. McCready, 457 U.S. 465, 482, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982); Bravman v. Bassett Furniture Industries, Inc., 552 F.2d 90, 98-99 (3d Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977). Blue Shield's interests would have been directly served by the price competition among dentists that existed prior to the horizontal arrangements taken by the organized dentists to resist successful marketing of participation contracts. It is certainly plausible that the absence of such price competition severely limited Blue Shield's ability to compete with other carriers in the market for sale of group dental insurance plans.
 
 
 25
 It is true that the dentists' horizontal agreement to resist participation also resulted in injury to Blue Shield subscribers, since its effect was that more subscribers were subject to the practice of balance billing. That damage, however, does not duplicate the lost income suffered by Blue Shield, because Blue Shield subscribers could never recover the latter. Thus, issues of duplicate recovery or apportionment of damages are not presented by the record now before us. Moreover, individual subscriber overcharges resulting from balance billing are relatively insignificant; hence, subscribers have only the slightest incentive to launch costly antitrust litigation in the public interest. Blue Shield, in contrast, as the immediate target of the organized dentists' conspiracy, is obviously the preferred private attorney general. Blue Shield is the victim "whose self-interest would normally motivate [it] to vindicate the public interest in antitrust enforcement[.]" Associated General Contractors v. Carpenters, 459 U.S. 519, 542, 103 S.Ct. 897, 910, 74 L.Ed.2d 723 (1983). In addition, the recognition that Blue Shield is a proper antitrust plaintiff keeps "the scope of complex antitrust trials within judicially manageable limits." Id. at 543, 103 S.Ct. at 911.
 
 
 26
 We hold, therefore, that on this record a summary judgment cannot be affirmed on the theory that Blue Shield cannot properly bring an action under section 4 or section 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26.
 
 V.
 
 27
 The organized dentists' immunity contention is predicated primarily on the first amendment. They contend that they have associational interests in advancing the standards of professional care which motivated their actions in this case. Those interests are not so great, however, as to afford a shield to professional conduct which forecloses competition. See National Society of Professional Engineers v. United States, 435 U.S. 679, 697-99, 98 S.Ct. 1355, 1368-69, 55 L.Ed.2d 637 (1978).
 
 
 28
 We are equally unimpressed with the organized dentists' effort to characterize their challenged activities as mere solicitation of governmental action with respect to passage and enforcement of laws. Eastern R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Any such activities were minor when compared to the massive effort directed toward convincing dentists collectively to resist participation contracts.
 
 
 29
 Relying on NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), the organized dentists also urge that we should affirm the summary judgment on the theory that they have a first amendment right to offer legal advice to members of the dental profession. If the departicipation resolutions were intended as legal advice, then it was extraordinarily bad, since the resolutions amounted to advice to join what appears, prima facie, to be a conspiracy in violation of the law. Unlike the antisolicitation statute involved in NAACP v. Button, 371 U.S. at 419, 83 S.Ct. at 330-31, the Sherman Act is not directed against solicitation for lawful purposes.
 
 
 30
 The activity disclosed in this record cannot as a matter of law be held to be immune from antitrust scrutiny by virtue of any associational rights protected by the first amendment.
 
 VI.
 
 31
 The final alternative ground for affirmance suggested by the organized dentists is the four-year time bar in 15 U.S.C. Sec. 15b. The third-party complaint was filed in March of 1982. It seeks both damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15, and injunctive relief under section 16, 15 U.S.C. Sec. 26. Although the four-year limitation period in 15 U.S.C. Sec. 15b is applicable by its terms only to the section 4 damages claim, we will assume, without deciding, that it would also apply to Blue Shield's claim for injunctive relief.[4]
 
 
 32
 The organized dentists correctly point out that many of their departicipation resolutions were adopted at meetings which occurred more than four years before March of 1982. In addition, they contend that many of the withdrawals from participation occurred more than four years before the date of filing of the counterclaim. As Blue Shield points out, however, its cause of action for damages accrued only when it suffered injury. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Moreover, each time a plaintiff is injured by a continuing conspiracy to violate the antitrust laws a new cause of action for damages accrues. Id. "[E]ach separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial." Id. at 338-39, 91 S.Ct. at 806. (citations omitted).
 
 
 33
 The summary judgment record as it now stands would permit a factfinder to conclude that the conspiracy charged by Blue Shield is a continuing one and that its effects continued well into the four-year period preceding the March, 1982 filing of the counterclaim. Most of the offending resolutions have never been rescinded. Blue Shield continues to encounter resistance to its participation contract traceable to the organized dentists' earlier actions. Additionally, there is evidence of overt acts in furtherance of the conspiracy occurring within the limitations period. Plainly, therefore, even if the four-year statute of limitations were deemed to be applicable to the claim for injunctive relief, that claim would not be time-barred. Furthermore, section 4 damages caused by any overt act taking place from March of 1978 forward may also be recovered. See Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 495-502, 88 S.Ct. 2224, 2232-36, 20 L.Ed.2d 1231 (1968).
 
 
 34
 Thus, we must reject the organized dentists' contention that the statute of limitations on the present record affords an alternative legal ground for affirming the summary judgment in their favor. If further factual material is presented, the district court may, of course, reconsider the statute of limitations defense.
 
 VII.
 
 35
 The summary judgment in favor of the organized dentists cannot be affirmed for the reasons on which the district court based its decision. No other basis for affirming a summary judgment appears in the record before us. The judgment appealed from, granting summary judgment on the federal law claims and dismissing the pendent state law claims, must therefore be reversed and the case remanded for further proceedings.
 
 
 
 [1]
 The appellees are the Pennsylvania Dental Association, the Delaware Valley Dental Society, the Erie County Dental Association, Inc., the Harrisburg Area Dental Society, the Luzerne County Dental Society, the Montgomery-Bucks Dental Society, the Odontological Society of Western Pennsylvania, the Scranton Dental Society, the York County Dental Society, the Fifth District Dental Society, Dennis W. King, D.D.S., Charles M. Ludwig, D.D.S., Theodore R. Paladino, D.D.S., Thomas L. Perkins, D.M.D., and Kay F. Thompson, D.D.S
 
 
 [2]
 The summary judgment was granted on Blue Shield's third-party counterclaim. The litigation has had a complex history. It originated when the Commonwealth of Pennsylvania filed a complaint against the organized dentists, charging that they violated the antitrust laws by encouraging dentists to terminate Blue Shield participating dentist agreements. The organized dentists filed a counterclaim against the Commonwealth and a third-party complaint against Blue Shield. Blue Shield answered, and filed the third-party counterclaim with which this appeal is concerned. The Commonwealth and the organized dentists entered into a settlement which resulted in dismissal of the original complaint and counterclaim. Thereafter, Blue Shield moved for and obtained summary judgment in its favor on the organized dentists' third-party complaint, and this court affirmed. Pennsylvania Dental Assn. v. Medical Service Assn. of Pennsylvania, 574 F.Supp. 457 (M.D.Pa.1983), aff'd. 745 F.2d 248 (3d Cir.1984), cert. denied, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). That left pending Blue Shield's federal and state law claims against the organized dentists
 
 
 [3]
 Specifically, the affidavits reveal that Holy Spirit Hospital and the Pennsylvania Senate, both purchasers of group dental coverage from Blue Shield, terminated their Blue Shield dental plans because of low dentist participation in their geographic areas
 
 
 [4]
 See Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc., 197 F.Supp. 627 (D.N.J.1961), aff'd, 307 F.2d 210 (3d Cir.1962), cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963)