332 F.3d 600
 INTERNATIONAL HEALTHCARE MANAGEMENT, a Nevada limited liability company; Health Hawaii Network, a Nevada limited liability company, Plaintiffs-Appellants,
v.
The HAWAII COALITION FOR HEALTH, a Hawaii nonprofit corporation; Hawaii Medical Association, a Hawaii nonprofit corporation; Queens Physician Group, a Hawaii nonprofit corporation; Arleen Jouxson-Meyers, M.D., an individual; Peter Locatelli, M.D., an individual; Leonard Howard, M.D., an individual; John Drouilhet, M.D., an individual; Lockwood Young, M.D., an individual, Defendants-Appellees.
 No. 01-17451.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 5, 2003.
 Filed June 6, 2003.
 
 John I. Alioto and Lisa Kimmel, Alioto & Alioto, San Francisco, CA, for the plaintiffs-appellants.
 M. Laurence Popofsky, Heller Ehrman White & McAuliffe, San Francisco, CA, for the defendants-appellees Hawaii Medical Association and Leonard Howard, M.D.
 Rafael G. Del Castillo, Honolulu, HI, for the defendants-appellees Hawaii Coalition for Health, Arleen Jouxson-Meyers, M.D., and Peter Locatelli, M.D.
 J. Thomas Rosch, Latham & Watkins, San Francisco, CA, for the defendants-appellees Queen's Physician Group, Lockwood Young, M.D., and John Drouilhet, M.D.
 Jack R. Bierig, Sidley Austin Brown & Wood, Chicago, IL, for the amicus.
 Appeal from the United States District Court for the District of Hawaii; Helen Gillmor, Presiding District Judge. D.C. No. CV-00-00757-HG/BMK.
 Before GOODWIN, RYMER, and T.G. NELSON, Circuit Judges.
 OPINION
 RYMER, Circuit Judge.
 
 
 1
 International Healthcare Management (IHM), a company that develops healthcare programs, and Health Hawaii Network (HHN), which was established to provide a network of doctors in Hawaii for a managed care health plan developed by IHM, appeal from summary judgment in favor of the Hawaii Medical Association (HMA), the Hawaii Coalition for Health ("the Coalition"), Queen's Physician Group (QPG), and certain of their officers who were also named as defendants.[1] IHM and HHN alleged a conspiracy to fix prices and to boycott their plan in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Hawaii law. The district court found no evidence to support either theory, and no evidence of QPG's involvement in the alleged conspiracy. It concluded that, in the absence of any agreement or threat to boycott HHN, or attempt to fix prices, the joint efforts of HMA and the Coalition to negotiate the terms of HHN's provider agreement caused no antitrust injury under state or federal law. We agree, and affirm.
 
 
 2
 * In 1997, IHM (and others not involved in this litigation) created the St. Francis Preferred Provider Organization managed care health plan ("St. Francis Plan") that it hoped to market to employers in Hawaii. HHN was the provider network for the St. Francis Plan.
 
 
 3
 The HMA is a not-for-profit professional association of physicians in the State of Hawaii. It is affiliated with the American Medical Association and has over 1600 members of whom 826 are active full pay members. At the time there were approximately 2500 active physicians in Hawaii. Among other things, the HMA reviews and provides information to its members about provider contracts, including managed care health plans operating in the state. The Coalition is a consumer advocacy organization that focuses on health care issues with a membership of physicians and non-physicians. QPG is an independent practice association (IPA) formed to enter into contracts with health plans.
 
 
 4
 When the Hawaii Medical Services Association (HMSA), which is Hawaii's Blue Cross/Blue Shield Plan, asked physicians to sign a new participating provider agreement (PPA)[2] in 1997, the Coalition, the HMA, QPG, and two other physicians' groups joined in a "Consortium" to discuss the PPA with HMSA. In HHN's view, this was the beginning of the conspiracy about which it complains. The Consortium asked HMSA to make a number of changes to the PPA (none of which included changes to the fee schedule or to physicians' compensation). The organizations comprising the Consortium communicated with their members about the progress of negotiations, and one letter noted that "[f]or the first time many of our physician organizations have joined forces and are working to seek improvement of HMSA's new [PPA]." HMSA revised its PPA somewhat, and the contract went into effect in 1998.
 
 
 5
 Against this background, HHN began recruiting physicians for its provider network in February 1998. A solicitation packet was sent to 1,000 doctors with HHN's participating provider agreement for the St. Francis Plan. Dr. Jouxson-Meyers happened to be on the mailing list. In her capacity as president of the Coalition, she wrote to HHN that its PPA contained several provisions which were similar to the ones HMSA had recently modified, and offered to help HHN improve its provider agreement. She also advised Coalition members that the PPA "is not very good" as it contained provisions similar to the initial version of HMSA's PPA.
 
 
 6
 HHN set up a meeting with Dr. Jouxson-Meyers; with HHN's blessing, she invited representatives from other organizations that had participated in the HMSA discussions to attend. An HMA representative was there, but no one came from QPG. HHN indicated that it would only consider concerns with its PPA that the Coalition put into writing. Dr. Jouxson-Meyers complied on March 21 with a letter that identified eleven specific concerns, including the requirement that physicians fully comply with the PPA's utilization management program or face a threat of reduced reimbursement and the lack of assurance that reimbursement rates would be fair or reasonable.[3] HHN forwarded the letter to Dr. Sidney Steinberg, a health care management consultant, who responded to the Coalition on April 20 that Dr. Jouxson-Meyers's letter raised several issues that "need review and either modification or clarification," including credentials evaluation and utilization management. He invited the Coalition to stay in touch as HHN "undertakes a comprehensive review of the provider agreement to assure that the issues you raised are properly addressed...."
 
 
 7
 Meanwhile, HHN acquired the assets of Pacific Benefit Services, Inc. (PBS). On April 29 HHN advised physicians who were PBS providers that their agreements with PBS were being assigned to HHN. This prompted the Coalition to communicate with its members about the assignment, and the HMA, Hawaii Federation of Physicians and Dentists, and the Coalition to issue an "Alert." The June 15 "Alert" informed members that their organizations had tried without success to enter a dialogue with HHN about "serious problems" with its PPA; that HHN had acquired PBS but may not have notified all PBS physicians that their PPAs had been assigned to HHN; and that they had met with the Insurance Commissioner, who expressed concerns about the number of corporate entities involved in HHN's health plan and the accuracy of the participating provider listings that HHN may be using to recruit members. The "Alert" reported that
 
 
 8
 "[t]he Insurance Commissioner suggested that it might be wise for physicians to wait until these issues can be clarified and resolved before signing up as a participating provider with HHN. If physicians have concerns about the possibility that their PBS Participating Agreement has been assigned to HHN, they could also call HHN to clarify the situation."
 
 
 9
 The Insurance Commissioner reviewed and commented upon a draft before the "Alert" was distributed.
 
 
 10
 On July 10, the HMA sent counsel for the St. Francis Plan a marked-up copy of the HHN provider agreement noting suggested changes. These suggestions were consistent with the modifications that HMSA had previously made to its PPA. Representatives of the HMA and HHN met several times in July 1998. The discussions centered on HHN's credentialing procedures; whether doctors were required to use only HHN's list of hospitals in all situations; the one day notice for inspection of records; the termination of doctors without cause; the indemnification provision; the quality of HHN's utilization management program; whether doctors should be allowed to provide HHN with information regarding their costs so HHN could consider those costs when revising the fee schedule; and the lack of an appeal process for doctors regarding reimbursement. HHN was unwilling to make any changes.
 
 
 11
 Overall, some 510 physicians signed up for the St. Francis Plan. Seventy physicians, as well as a large IPA and Queens Medical Center, the largest hospital in Hawaii, executed PPAs after the HMA "Alert." Fewer than a dozen withdrew at any time. Nevertheless, HHN abandoned its marketing efforts in Hawaii and filed this action. The district court granted summary judgment on all claims, and this timely appeal followed.[4]
 
 II
 
 12
 The material facts are largely undisputed. "Although antitrust cases are sometimes difficult to resolve on summary judgment because of their factual complexity, summary judgment is still appropriate in certain cases." County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir.2001) (citing Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991)). Summary judgment is only disfavored in "`complex antitrust litigation where motive and intent are important, proof is largely in the hands of the alleged conspirators, and relevant information is controlled by hostile witnesses.'" See Metronet Servs. Corp. v. U.S. West Communications, 329 F.3d 986, 2003 WL 21181644 at *8 (9th Cir. May 21, 2003) (quoting Toscano v. Prof'l Golfers' Ass'n, 258 F.3d 978, 982 (9th Cir.2001)). This is not such a case.
 
 
 13
 * HHN argues that the district court erroneously held that it is lawful for physician associations to negotiate with health plans on behalf of their competing physician members. It faults the court for having found that HHN flunked the Monsanto v. Spray-Rite test[5] because HHN failed to produce evidence that: (1) the organizations held discussions or negotiations that concerned the HHN fee schedule; (2) the organizations threatened retaliation against member physicians who signed the HHN PPA; or (3) member physicians had explicitly agreed among themselves and with the organizations to boycott HHN. HHN submits that there is no authority that allows professional associations to restrain competition as long as they avoid a short-list of anticompetitive acts. Instead, it urges us to follow the Third Circuit's decision in Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania, 815 F.2d 270 (3d Cir.1987), which reversed a summary judgment in favor of organized dentists who engaged in concerted activity to modify Blue Shield's cost containment efforts.
 
 
 14
 The HMA does not dispute that the Coalition and the Federation agreed to discuss the HHN contract with HHN and jointly sent out the "Alert." However, it does maintain that the agreement was not unlawful. In the HMA's view, all that remains without evidence of a boycott or of price fixing is the fact of joint negotiations and communications. It contends that these activities fall within the safe harbor of United States v. A. Lanoy Alston, D.M.D., P.C., 974 F.2d 1206 (9th Cir.1992), where we applied a per se analysis and upheld the conviction of dentists who had agreed on higher co-payment fees to be paid by prepaid dental plans, but recognized that other kinds of collective activity involving the relationship between health care providers and plans may be legitimate. The HMA also argues that it was entitled to express its opinions and to share information about health care plans, whether or not its opinions carried weight and regardless of market effects.
 
 
 15
 We start with HHN's "short-list" argument. HHN is undoubtedly correct that acts other than negotiating about fees, threatening retaliation or coercing members not to become a plan provider, and agreeing to boycott HHN may run afoul of the antitrust laws. We do not understand the district court to have held otherwise. HHN's complaint alleged a conspiracy to negotiate fees and to boycott HHN to support a price fixing arrangement among physicians in Hawaii, and it was toward these allegations that the organizations' motion for summary judgment was directed and to which the district court responded by holding that HHN failed to produce evidence of conduct that amounts to price fixing or an agreement to boycott for the purpose of price fixing. HHN effectively conceded this in the district court. While its argument on appeal still has boycott and price-fixing overtones, its focus is on the joint negotiation itself.
 
 
 16
 HHN asserts that such an arrangement is per se unlawful, but we disagree. Per se categories are not to be expanded indiscriminately to new factual situations. See, e.g., FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 458-59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); Am. Ad Mgmt., Inc. v. GTE Corp., 92 F.3d 781, 784-85 (9th Cir.1996). The HMA and the Coalition's joint efforts to modify non-fee terms of HHN's PPA is not in a class of restraints previously held to be per se unreasonable, see Ind. Fed'n of Dentists, 476 U.S. at 457-58, 106 S.Ct. 2009, nor is it a practice that "`facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 2003 WL 21058236, at *3 (9th Cir. May 13, 2003) (quoting N.W. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co., 472 U.S. 284, 289-90, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985)). As we observed in Alston, the arena in which healthcare providers deal with plans is a complex and evolving one that may in some circumstances justify collective action:
 
 
 17
 Medical plans serve, effectively, as the bargaining agents for large groups of consumers; they use the clout of their consumer base to drive down health care service fees. Uniform fee schedules — anathema in a normal, competitive market — are standard operating procedure when medical plans are involved. In light of these departures from a normal competitive market, individual health care providers are entitled to take some joint action (short of price fixing or a group boycott) to level the bargaining imbalance created by the plans and provide meaningful input into the setting of the fee schedules. Thus health care providers might pool cost data in justifying a request for an increased fee schedule. Providers might also band together to negotiate various other aspects of their relationship with the plans such as payment procedures, the type of documentation they must provide, the method of referring patients and the mechanism for adjusting disputes. Such concerted actions, which would not implicate the per se rule, must be carefully distinguished from efforts to dictate terms by explicit or implicit threats of mass withdrawals from the plans.
 
 
 18
 Alston, 974 F.2d at 1214 (citations omitted).
 
 
 19
 The record here is quite unlike Pennsylvania Dental Ass'n. In Pennsylvania Dental Ass'n, concerted action by organized dentists to encourage dentists to withdraw from Blue Shield to force Blue Shield to change the upper limit on charges by participating dentists was manifest. Members of several local dental associations passed resolutions recommending withdrawal; written pledges to try to withdraw from participation were circulated among dentists; officials of the Pennsylvania Dental Association threatened Blue Shield that more resignations would take place unless it modified the cost containment efforts to which the organized dentists objected; and, when Blue Shield held firm, more resolutions were passed and mass withdrawals occurred. 815 F.2d at 272-73. This "abundance of direct evidence of concerted action," id. at 272, made the case an easy one for the Third Circuit. As the court said, finding a violation of Section 1 followed a fortiori from FTC v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). Id. at 275. In Indiana Federation, there was a horizontal agreement among participating dentists to withhold the forwarding of x-rays to insurance companies along with their customers' claim forms. Ind. Fed'n of Dentists, 476 U.S. at 455, 106 S.Ct. 2009. The Supreme Court held that this refusal to compete with respect to the package of services offered to customers could not be sustained. Id. at 459, 106 S.Ct. 2009; see also Alston, 974 F.2d at 1207-08 (fifty dentists met to discuss the fees they were receiving under certain health plans and sent letters requesting higher fees); Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 335-36, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (doctors agreed by majority vote to set maximum fees they could claim for certain health services provided to policyholders of specified health plans).
 
 
 20
 HHN contends that there is similar, direct evidence that the HMA, the Coalition and QPG were members of a combination (the Consortium) whose purpose was to accomplish by joint action what physicians could not accomplish as competitors. This evidence consists of a declaration by Jonathan Won, the HMA's former executive director, that the Coalition organizations joined together to bring HMSA to the bargaining table and collectively to negotiate terms of physician provider agreements with managed health care organizations. However, this alone does not show a fee-setting motive or any other unlawful objective. Won also opined that at one point during the HMSA negotiations, an HMA communication gave a false impression to physicians that the provider contract could be signed; and he declared that when the HMA speaks, its physician members listen and a substantial number take whatever action that the HMA recommends. Again, this is not direct evidence of anything unlawful; at most it shows that the HMA is influential. As the Seventh Circuit explained in Schachar v. American Academy of Ophthalmology, Inc., 870 F.2d 397, 399 (7th Cir.1989), "[a]n organization's towering reputation does not reduce its freedom to speak out." There, the Academy had criticized radial keratotomy as "experimental" and called on the profession to use caution until more research was done. Id. at 398. The court rejected ophthalmologists' claim that this amounted to a restraint of trade because the communication did not constrain anyone to follow the advice. Id. Much the same can be said of what the HMA and Coaltion did in this case.
 
 
 21
 Finally, HHN posits that the organizations' conduct is not lawful under Alston, and that per se analysis may be appropriate, where joint negotiations are accompanied by threats of mass withdrawals. It argues that such threats are implicit in the communications to physicians on the status of the negotiations. We disagree that any such inference can reasonably be drawn from the communications in this case. The "Alert" is the only communique that arguably comes close; it conveyed a suggestion from the Insurance Commissioner that physicians wait before signing up with HHN until issues about the number and interrelationship of corporate entities involved in HHN, and the accuracy of the provider listings for PBS, were resolved. These concerns had nothing to do with price, or any other element of competition so far as the record discloses. The communications appear to have had little, if any, impact; no more than ten out of 500 physicians withdrew from the St. Francis Plan after the "Alert," and seventy signed HHN provider agreements after the "Alert" was issued. Nor is there any evidence that physician decisions about participating in, or withdrawing from, the St. Francis Plan were not wholly independent. The HMA had no authority to negotiate for individual physician members and physicians were not bound by anything that the HMA or Coalition said or did. In these circumstances there is no need to decide how far Alston extends, or whether it would ever be appropriate to invoke the per se rule if threats of mass withdrawal were made to leverage a change in terms. Suffice it to say here that there is no support in this record for finding that the organizations' communications implicitly or explicitly contained such threats.
 
 
 22
 HHN likewise submits that the organizations' agreement to negotiate in tandem and communicate with physicians in detail exceeds the bounds of the procompetitive exchange of information sanctioned in Maple Flooring Manufacturers' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), or Alston. However, the record is similar to Maple Flooring in that neither case contained evidence of agreement among the association members fixing prices or of anticompetitive effect. In Maple Flooring this left the gathering and dissemination of information as to the cost and price of flooring, which the Supreme Court had no difficulty holding was not within the purview of the antitrust laws. Maple Flooring, 268 U.S. at 583-84, 45 S.Ct. 578. As the Court explained, it is not the combination as such, or the circulation of information as such, that matters, but the ability to infer from the circumstances of a case that "concerted action had resulted or would necessarily result in tending arbitrarily to lessen production or increase prices." Id. at 585, 45 S.Ct. 578.
 
 B
 
 23
 Even if the per se analysis should not be applied, HHN argues that the district court wrongly decided disputed issues of fact which, if resolved in its favor, would show an unreasonable restraint of trade under the rule of reason.[6] It relies on evidence that the Consortium's purpose was to increase physicians' bargaining power with managed care health plans, that the organizations' negotiations were accompanied by communications to physicians, and that the Consortium understood that these communications facilitated joint action by physicians who supported the negotiations. However, these facts alone do not show anticompetitive intent for reasons we have already explained. We are not impressed with HHN's suggestion that these negotiations and communications were a "facilitating practice" of the sort condemned as an unreasonable restraint of trade in American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921). In American Column & Lumber there was an elaborate plan among competitors for the exchange of current price and sales information, market forecasts, significant suggestions as to future prices and production, and meetings, all facilitated by an association that administered the plan. Id. at 394-96, 42 S.Ct. 114. Nothing approaching this order of magnitude occurred here. There were no communications about specific fees or reimbursement levels; neither the HMA nor the Coalition asked to review or revise the fee schedule; and so far as the record discloses, no one complained that HHN's fees were too low. The HMA did suggest that participating physicians individually be given thirty days to comment on proposed changes in reimbursement methodology, and it asked for a "fair and reasonable" standard to govern reimbursement rates. But nothing in the record indicates that either request had the purpose or effect of unreasonably affecting an element of competition.
 
 
 24
 Neither is HHN's argument persuasive that injury to competition is evident from the Consortium's successful negotiation with HMSA to change physician oversight and cost control measures. HHN submits that physician oversight is the core economic term of a managed care plan. The HMA and the Coalition used the "Alert" to make sure that terms they disliked in the HMSA PPA were not part of any other health plan in Hawaii. Thus, HHN would have us conclude, their concerted action to change those terms is price-fixing by any other name and therefore patently anticompetitive. However, there is no basis in the record for reaching this conclusion. It may well be that modifying the terms challenged by the HMA and the Coalition has economic consequence, but economic consequence is not the same thing as anticompetitive effect. Without more than appears in this record, we cannot say that the anticompetitive effect of modifying the marked-up provisions is immediately obvious.
 
 
 25
 Finally, HHN dismisses patient welfare as a justification for the organizations' conduct, pointing out that the Supreme Court rejected a "quality of care" explanation for the Federation's position in Indiana Federation of Dentists and noted that insurers do not lack incentives to consider both the welfare of the patient and minimization of costs. 476 U.S. at 463, 106 S.Ct. 2009. While true, both the Coalition and the HMA have an interest in informing their members of developments in managed health care, and their members have an interest in receiving that information. Disseminating information that fosters rational business decisions is pro-competitive. See, e.g., Maple Flooring Ass'n, 268 U.S. at 582-83, 45 S.Ct. 578. Events in this case, for example, were influenced by the failure of the PBS plan. However, HHN suggests that the nature of the information communicated would have been different — and less anticompetitive — if the organizations' true objective had been solely to educate physicians on managed care provider contracts. In that case, HHN supposes, the HMA and Coalition would simply have discussed plan provisions in general, not the specifics of a particular PPA. Perhaps so, but a reasonable restraint (assuming there is a restraint) does not become unreasonable just because the least restrictive means were not used.
 
 
 26
 In sum, the record shows no price-fixing agreement and none to boycott, or threaten to boycott, the St. Francis Plan for the purpose of affecting fees or reimbursement. It shows only that the HMA and Coalition jointly negotiated with payors and communicated with providers about plan provisions. QPG had no role in the HHN negotiations at all. No one was bound by what the organizations did, and their negotiations and communications had essentially no impact. In these circumstances, we conclude that no unreasonable restraint of trade exists.
 
 III
 
 27
 HHN's state antitrust claims fail for the same reasons as their federal claims because Hawaii antitrust statutes are interpreted "in accordance with judicial interpretations of similar federal antitrust statutes." See HAW. REV. STAT. § 480-3 (WESTLAW through 2002 Sess.). Argument was not developed on its other state law claims, including tortious interference with prospective economic advantage and tortious interference with contracts, and so those issues are deemed abandoned. See Collins v. City of San Diego, 841 F.2d 337, 339 (9th Cir.1988).
 
 
 28
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 We sometimes refer to these parties collectively as "organizations" but will identify them by name where appropriate. Unless context requires otherwise, we will also refer to IHM and HHN together as HHN. Those named individually include Dr. Leonard Howard, a retired Kaiser physician, who was president of the HMA at the time, Dr. Arleen Jouxson-Meyers and Dr. Peter Locatelli, respectively president and vice president of the Coalition, and Dr. Lockwood Young and Dr. John Drouilhet, who were members of QPG's executive board
 
 
 [2]
 A participating provider agreement is a physician's contract with a health plan. It establishes the doctor's rights and responsibilities in providing medical services to insured patients. The PPA will often include the terms of the plan's utilization management and quality assurance programs that establish the process doctors must follow to be reimbursed for patient care they provide under a managed care program
 
 
 [3]
 Other concerns related to HHN's credentialing procedures for doctors; the provision requiring doctors to take full responsibility for medical decisions even though HHN's agreement limited their range of options; the provision allowing for inspection of a doctor's records on one day's notice; the provision allowing termination of doctors without cause; the lack of a comment period regarding amendments to the agreement; and an indemnification provision
 
 
 [4]
 The American Medical Association filed a brief as amicus curiae in support of the HMA, the Coalition, QPG, and the individual physicians who defend the district court's ruling
 
 
 [5]
 Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). In Monsanto, the Court considered the standard of proof required to find a vertical price-fixing conspiracy in violation of Section 1 of the Sherman Act. It held that "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others `had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Id. at 764, 104 S.Ct. 1464 (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir.1980)).
 
 
 [6]
 "The rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects. We review all the facts, including the precise harms alleged to the competitive markets, and the legitimate justifications provided for the challenged practice, and we determine whether the anticompetitive aspects of the challenged practice outweigh its pro-competitive effects."Paladin, 328 F.3d 1145, 2003 WL 21058236 at *5.