**IN re LOWER LAKE ERIE IRON ORE ANTITRUST LITIGATION.**

**This Document Relates To: All Actions.**

**Master File No. MDL 587.**

United States District Court,
E.D. Pennsylvania.

Feb. 27, 1991.

Howrey & Simon by Richard T. Colman, Robert F. Ruyak, Robert L. Green, Basil C. Culyba, Marcia Press Kaplan, Washington, D.C., for plaintiffs Jones & Laughlin Steel, Inc. (LTV), Wheeling–Pittsburgh Steel Corp. and Republic Steel Corp. (LTV).

Thorp, Reed & Armstrong by William M. Wycoff, Richard Riese, Pittsburgh, Pa., for plaintiffs Nat. Steel Corp. and Sharon Steel Corp.

Jenner & Block by Bruce J. Ennis, Kit Adelman–Pierson, Washington, D.C., and Lawrence R. Velvel, Nashua, N.H., for plaintiffs David Reaney, Ambrosia and Erie.

Cohen, Milstead & Hausfeld by Jerry S. Cohen, Ann C. Yahner, Washington, D.C., for plaintiff Tauro Bros. Trucking Co.

Beery & Spurlock Co., L.P.A. by Elizabeth L. Rabenold, Paul F. Beery, Columbus, Ohio, for plaintiffs Wills Trucking Inc. and Toledo World Terminals.

Squire, Sanders & Dempsey by Kenneth C. Anderson, James V. Dick, Timothy W. Bergin, Washington, D.C., for defendant Bessemer and Lake Erie R. Co.

Pepper, Hamilton & Scheetz by Laurence Z. Shiekman, M. Duncan Grant, Robert E. Heideck, Philip H. Lebowitz, Philadelphia, Pa., for defendant Consol. Rail Corp.

Sidley & Austin by Richard J. Flynn, Lee A. Monroe, Stephen S. Hill, Merinda D. Wilson, Martin Stern, Jill Phillips, Gene Schaerr, Washington, D.C., for defendant Norfolk and Western Ry. Co.

## OPINION AND ORDERS ON POST–TRIAL MOTIONS

FULLAM, Senior District Judge.

This multidistrict litigation, in which ten antitrust suits were consolidated in this court for pretrial proceedings, and retained for trial, involves a conspiracy dating from the mid–1950's on the part of a group of defendant railroads (the Penn Central Corporation (Penn Central), the Chesapeake & Ohio Railway Company (C & O), the Baltimore & Ohio Railroad Company (B & O), CSX Corporation (CSX), the Bessemer & Lake Erie Railroad Company (B & LE), the Pittsburgh & Lake Erie Railroad Company (P & LE), Consolidated Rail Corporation (Conrail), the Norfolk & Western Railway Company (N & W), and Norfolk Southern Corporation (Norfolk Southern)) to monopolize the dock handling, storage and land transportation of iron ore along lower Lake Erie. The claims against all defendants except the B & LE were settled or dismissed before or during trial.

The liability phase of the trial commenced on May 9, 1989. The jury returned a verdict on June 19, 1989 in favor of plaintiffs in *Wills Trucking, Inc., et al. v. Chesapeake & Ohio Railway Co., et al.,* Civil Action No. 84–2010 (*Wills*), *C.D. Ambrosia Trucking Co. v. Chesapeake & Ohio Railway Co., et al.,* Civil Action No. 84–2012 (*Ambrosia*), *Republic Steel Corp. v. Penn Central Corp.,* Civil Action No. 84–2079 (*Republic*), *National Steel v. C & O Ry.,* Civil Action No. 84–2134 (*National*), *Jones & Laughlin Steel Inc. v. Penn Central Corp., et al.,* Civil Action No. 84–2135 (*J & L*), *Wheeling–Pittsburgh Steel Corp. v. Penn Central Corp., et al.,* Civil Action No. 84–2138 (*Wheeling–Pitt*), *Tauro Bros. Trucking Co. v. Baltimore & Ohio Railroad Co., et al.,* Civil Action No. 84–2781 (*Tauro*), *Sharon Steel Corp. v. Penn Central Corp., et al.,* Civil Action No. 84–5562 (*Sharon*), and *Erie–Western*

*Pennsylvania Port Authority, et al. v. Chesapeake & Ohio Railway Corp., et al.,* Civil Action No. 84–5760 (*Erie*), and in favor of defendant B & LE in *David W. Reaney, et al. v. Chesapeake & Ohio Railway Co., et al.,* Civil Action No. 84–2722 (*Reaney*). The damages trial before a different jury began on June 26, 1989, and culminated on July 18, 1989 in verdicts totalling $243.5 million in actual damages. With appropriate trebling under federal law and doubling under state law, the total verdicts amount to $638.5 million.

## I. BACKGROUND

Much of the iron ore processed into steel by the plaintiff steel companies originates in mines located in Michigan, Minnesota and eastern Canada. Iron ore is shipped across the Great Lakes and unloaded at docks along lower Lake Erie in Pennsylvania and Ohio. Many of these docks were owned by the railroads, and were the primary handlers of ore. For many years, the prevailing method of unloading bulk commodities such as iron ore was by means of huletts, which are large cranes affixed to the docks. The huletts lifted bulk commodities such as ore from the ships, known as "bulkers"; the cargo was then either loaded into railroad cars for immediate transport, or transferred into storage. During the period of the conspiracy, rates for these services at all of the railroad docks were identical. The private (i.e. non-railroad) docks in the vicinity were not equipped with huletts, and thus could not compete for iron ore traffic.

In the 1950's, some iron ore producers began to "pelletize" their ore, making possible its transportation via self-unloading vessels. These vessels, as the name implies, were capable of unloading themselves by means of a conveyor belt. With the advent of larger self-unloaders in the 1960's, these ships could carry twice the load carried by the conventional bulkers and could unload themselves more quickly and without special equipment. The railroads, unwilling to lose the profitable iron ore trade and fearful of losing their substantial capital investments in huletts, decided to halt the progress of self-unloader technology, in part by keeping dock-handling rates for self-unloaders artificially high: the railroads charged the steel companies the same dock handing rates for self-unloaders as for bulkers.

Another aspect of the conspiracy involved line haul rates, which are the rates charged by the railroads for transporting ore and other commodities from specific docks to the steel companies' mills. Pursuant to ICC requirements, the rates from the railroad docks to all steel mill customers were identical, irrespective of the distances involved. The plaintiff private docks were effectively precluded from handling ore from the self-unloaders by the railroads' refusal to publish competitive commodity line haul rates from these private docks to the steel mills; and the plaintiff trucking companies (which, not surprisingly, had no access to railroad docks) were therefore unable to compete with the railroads for land transportation. Moreover, the railroads either refused outright to sell or lease to private concerns any property that could be used as an ore dock, or would only sell or lease the property subject to restrictions against such use.

In the liability phase of the trial, the jury found that the B & LE participated in this conspiracy in violation of sections 1 and 2 of the Sherman Act and of Ohio's antitrust law, the Valentine Act, and that at least one overt act in furtherance of the conspiracy occurred after October 13, 1977. This jury further found: (1) that the conspiracy injured the plaintiff steel companies by foreclosing and/or delaying the utilization of self-unloaders and by rendering them unable to use private docks; (2) that the conspiracy injured the *Erie* plaintiffs by preventing them from subleasing or purchasing Penn Central's ore dock at Erie, Pennsylvania or from having competitive iron ore rates at that dock; (3) that the conspiracy injured Ambrosia by delaying iron ore handling by private docks, which would permit the trucking of the ore; (4) that the conspiracy injured Tauro by foreclosing and/or delaying the utilization of self-unloaders at docks to which trucks would be allowed access, and by preventing

steel mills from fully using docks; and (5) that the *Wills* plaintiffs were injured by, among other things, the railroads' refusal to lease or sell dock properties without restrictions, preventing Wills from engaging in an iron ore business at Toledo, Ohio and from providing a trucking service in combination with its dock services. Finally, the jury found that the railroads took affirmative steps to conceal the conspiracy.

## II. SUMMARY OF LEGAL ISSUES

The legal and factual issues involved in this litigation are numerous and complex. They involve such matters as whether defendant's activities were exempt from antitrust scrutiny at the time they occurred; whether plaintiffs have "antitrust standing" to assert their various damage claims; whether some or all of plaintiff's claims are barred as indirect, under the doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); whether plaintiffs can maintain antitrust claims under Ohio's Valentine Act; whether some or all of plaintiffs' claims, under federal law or state law, are time-barred; and, of course, whether various aspects of the juries' verdicts are adequately supported by the evidence.

Many of the legal issues were addressed pre-trial at various stages, *see, e.g.*, Pretrial Orders Nos. 4, 11, and 49, but must be re-visited in light of the more complete factual development at trial.

It is a fair generalization to state that, throughout the trial, doubtful issues were resolved in favor of submitting claims and defenses to the jury for specific factual findings. Thus, as to any issue where the correctness of this court's pretrial rulings was fairly debatable, the parties were permitted to develop the factual record. This approach has had two notable impacts upon my assessment of post-trial briefing: a particular award is not automatically invalid merely because it is arguably inconsistent with some aspect of a pretrial ruling—the goal is to achieve the correct disposition of the issue. Conversely, aspects of the jury verdicts should not automatically be regarded as unassailable because the issue

was submitted to the jury and there is evidence to support it—again, the ultimate question is whether the correct result has been reached.

## III. IMMUNITY

▮ Railroad rates and charges which are subject to the jurisdiction of the Interstate Commerce Commission are conclusively presumed to be reasonable, hence the defendant cannot be held liable for damages under the antitrust laws because a plaintiff has been required to pay such rates or charges. *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), and *see Square D Company v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

▮ Moreover, the process by which ICC–approved tariffs become effective necessarily involves a great deal of concerted action among competing railroads. Congress has therefore specifically exempted from antitrust scrutiny all railroad actions taken pursuant to the specified procedures. Section 5(a) of the Interstate Commerce Act, as amended by the Reed–Bulwinkle Act of 1948, 49 U.S.C. § 10701(a). Pursuant to that statute, the ICC approved the Agreement of Eastern Railroads which established the rate bureau (the Coal, Coke and Iron Ore Committee), of which the defendant was a member. Eastern Railroads—Agreement, 277 ICC 279 (1950). All claims based upon railroad action taken pursuant to that agreement are barred by the § 5(a) immunity.

▮ Although competing railroads are permitted to agree on rates, charges, divisions and the like, pursuant to the rate-bureau mechanism, and to agree upon proposed tariffs to be filed with the ICC, each railroad must remain free to propose its own tariffs, independently of the group tariff; agreements among railroads which purport to curtail such freedom of independent action—*e.g.*, threatened coercive action if a different individual tariff is proposed—can give rise to antitrust liability. And, of course, combinations and agreements on matters other than tariff propos-

als, taken outside the Rate–Bureau mechanism, can also give rise to antitrust liability.

 These issues were fully explained to the respective juries, and there is no present contention that either charge was erroneous. The liability jury found that the defendant had, indeed, violated the antitrust laws by conduct which was not immune from antitrust scrutiny, and the damages jury found that plaintiffs' damages were attributable to non-immune conduct. Contrary to defendant's present argument, these findings are amply supported by the evidence.

Literally thousands of documents, from the railroads' own files, establish beyond dispute the existence of an illegal conspiracy, dating back to at least 1950, to prevent self-unloading vessels, private docks, and trucking firms from gaining a foothold in the transportation of ex-lake iron ore. The record is so clear and complete, in fact, that it can be read to suggest that the participants may have genuinely believed that the antitrust laws did not apply to railroads at all. In part because of this phenomenon, over plaintiffs' objection at trial, I submitted to the jury the issue of whether the defendant may have been acting in the good-faith belief that it was merely carrying out policies approved or encouraged by the ICC. The jury rejected this "regulatory climate" contention, however, hence that issue need not be considered further.

## IV.
## STANDING/INDIRECT–PURCHASER CONTENTIONS

It is a principal contention of the defendant that plaintiffs' damage claims are precluded by the indirect-purchaser doctrine announced in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), as interpreted in *Midwest Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir.1979). In *Illinois Brick,* a price-fixing case, it was held that only the initial purchaser who paid the inflated price could maintain an action under the antitrust laws for treble damages. Although subsequent purchasers no doubt paid an inflated price also, the court held that their damages were too indirect; that to permit indirect purchasers to sue under the antitrust laws would expose the defendant to unlimited potential liability; and that problems of proof would render it unduly difficult to prevent duplicative recoveries. In *Midwest Paper,* the Third Circuit Court of Appeals applied that doctrine to rule that only purchasers from a price-fixing conspirator could sue under the antitrust laws; purchasers from non-conspiring competitors of the conspirators could not recover, even though the price-fixing conspiracy may well have enabled the non-conspiring competitor to charge a higher price than would otherwise have obtained.

Applying these principles to the present factual situation is not an easy task, at least as to some of the plaintiffs' claims.

The ultimate verdict in this case awards the various steel companies damages in one or more of the following categories: inflated dock-handling charges they were required to pay; damages they suffered because of inflated cost of lake transport of iron ore, because of suppression of self-unloader technology; additional "demurrage" costs incurred (as to plaintiff Wheeling–Pitt only); and additional "investment costs" because of delay in acquiring self-unloading vessels (as to plaintiff National Steel only).

The Erie plaintiffs were awarded damages for lost profits resulting from having been excluded from establishing a private dock. And the trucking-company plaintiffs were awarded damages in the form of profits allegedly lost because of their exclusion from the iron-ore hauling business.

 No serious *Illinois Brick* issues arise with respect to the steel companies' material-handling awards, nor with respect to the claims of the Erie plaintiffs or the trucking company plaintiffs, but the claims of the steel company plaintiffs for damages associated with the delay in introduction of self-unloader technology (apart from the extra dock-handling expenses) present some very close questions.

Plaintiffs' claims are based on the contention that, by refusing to provide a line-haul rate from private docks which could handle self-unloaders, and by insisting upon charging the same price for unloading a self-unloader as for unloading a bulker which required the use of huletts, and by concertedly refusing to make lake-front property available for use by private docks, the defendants delayed the introduction of the more efficient self-unloaders in the transport of iron ore across the Great Lakes.

It was not until the Poe Lock was enlarged so as to accommodate 1,000–foot vessels that the use of self-unloaders became advantageous for handling iron ore. A substantial portion of the capacity of a self-unloader vessel is occupied by the self-unloading mechanisms; vessels less than 1,000 feet in length could not also hold a sufficient quantity of iron ore pellets to justify the substantial additional expense associated with construction of such vessels. But once it became feasible to use 1,000–foot vessels, the self-unloaders did have the potential for large savings, not only in dock-handling expense (if private docks could have been used), but also in operating expenses.

With respect to the inflated dock-handling charges, the plaintiff steel companies were customers of the railroads—direct purchasers within the meaning of *Illinois Brick*. With respect to the amounts claimed because the steel companies paid more for the lake transport of ore than they allegedly would have absent the conspiracy, the analysis is less clear. The shipping concerns which transported iron ore across the lakes in "bulker" vessels charged more for that service than would have been necessary if self-unloaders had been in use. But under the doctrine of *Illinois Brick*, it would seem that the shipping companies, rather than these plaintiffs, are the only firms entitled to assert such claims. Plaintiffs contend, however, that, but for the conspiracy, plaintiffs themselves would have acquired self-unloading vessels, and would have benefitted directly from the reduced costs of operating such vessels. On that theory, the conspiracy can be said to have constituted a boycott, or exclusion-from-the-market, rather than a price-fixing arrangement. Thus, whether the steel companies' claims for "self-unloader" damages—by far the largest portion of their awards—can be sustained depends upon whether the evidence shows that they had both the ability and the intention to enter the lake-transport market at the relevant times.

There is ample evidence that the steel companies would have sought the lowest-cost method of transporting iron ore from its source to their mills, and would have utilized self-unloaders had they been available. And, if the jury accepted the testimony of plaintiffs' witnesses, the jury could well have found that the plaintiff steel companies would have purchased or leased their own self-unloader vessels. *See, e.g.,* testimony concerning National's acquisition of the vessel *Stinson,* and the testimony of Mr. Dragoneer (liability N.T. 772) and Mr. Stuthers (liability N.T. 838–44).

■ The facts of this case do not fit comfortably on either side of the line between permissibility and impermissibility established by *Illinois Brick, Midwest Paper,* and *Pennsylvania Dental Ass'n v. Medical Services Ass'n,* 815 F.2d 270 (3d Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987). Plaintiffs were purchasers of lake transportation services. As a direct result of defendants' conspiracy, they were required to pay excessive dock charges—excessive because the railroads charged more at their own docks than they should have, and because the railroads impeded the establishment and development of competing private docks. As a result of the unavailability of lower dock charges, there was no economic incentive to develop 1,000–foot self-unloaders, so that trans-lake transportation cost more. From the perspective of *Illinois Brick,* it can be said that the conspiracy increased the costs of the shipping companies; plaintiffs, as indirect purchasers, cannot recover from defendant the additional costs paid to the shipping companies—the providers of lake transportation are the only acceptable plaintiffs. From the perspective of *Mid-*

*west Paper,* plaintiffs purchased transportation services from non-conspirators, and cannot claim to have been overcharged for trans-lake transportation by the defendants.

On the other hand, the *Pennsylvania Dental Ass'n* case makes clear that, in some circumstances, more than one class of plaintiffs has antitrust standing and can be permitted to recover damages, so long as there is no duplication of recoveries, and no insoluble apportionment problems arise. Here, plaintiffs argue, their damages are distinct from damages which might be recovered by vessel companies (plaintiffs were denied cost-savings, vessel companies may have lost business).

Although the question is a close one, I believe the critical factor here is the steel companies' history of direct involvement in ownership and control of ore vessels. Although direct, outright, ownership may have been relatively rare, it is reasonably clear that, through long-term leases or other contractual arrangements, the steel company plaintiffs did in fact assume responsibility for financing and operating ore-carrying vessels. It was reasonable for the jury to conclude that, but for the conspiracy, plaintiffs would have been similarly involved with self-unloaders, and would have achieved direct cost-reductions. The case more nearly resembles market-exclusion than a pure price-fixing situation. Accordingly, although with less than complete confidence, I conclude that the lake transportation savings awards should not be disturbed.

## V. "INVESTMENT–COST DAMAGES" —NATIONAL STEEL

■ The jury awarded plaintiff National Steel $10.4 million under the Valentine Act, and $6.3 million under the federal statute, claimed by National as additional "investment costs" it had sustained by reason of the conspiracy. Although supported by expert testimony, these awards are, I believe, impermissible. National did eventually invest in self-unloader vessels. It claimed that the vessels cost more to build than would have been the case if they had been

constructed earlier. The inescapable conclusion, however, is that the difference in costs reflects merely the impact of inflation, presumably offset by the time-value of money, and not an actual loss to the plaintiff. As to these claims, defendants' motion for judgment n.o.v. will be granted. Contrary to plaintiff's assertion, defendant adequately preserved this issue in its motion for a directed verdict.

## VI. DEMURRAGE—WHEELING– PITTSBURGH

■ Plaintiff Wheeling–Pitt claims to have experienced increased demurrage expenses as a result of the conspiracy. The jury awarded damages of $1.3 million under the Valentine Act and $1 million under the federal statute for those claimed losses. Plaintiff clearly established that its demurrage expenses have sharply declined with the advent of self-unloader-private dock transportation of pelletized ore. Defendant argues that other steel company plaintiffs concluded that their demurrage charges either were not affected, or were decreased, during the period of the conspiracy, and, therefore, Wheeling–Pitt's contrary experience must be attributable to causes other than the conspiracy.

I am not prepared to rule, as a matter of law, that all steel companies must claim and prove the same kinds of damages, or that all were required to conduct their operations in the same manner. Defendant's argument concerning causation was forcefully presented to the jury. Viewed in the light most favorable to the plaintiff, the evidence supports the jury's factual finding. The jury's verdict cannot be disturbed.

## VII. LIMITATIONS/LACHES ISSUES

The parties agree that all federal antitrust claims arising before October 14, 1977 are time-barred, but dispute the impact of that cutoff date upon the correct measurement of plaintiffs' damages.

### A. *Federal Claims*

■ Defendant B & LE, relying on *Zenith Radio Corp. v. Hazeltine Research,*

*Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), argues vigorously that the statute of limitations for federal antitrust actions, 15 U.S.C. § 15b, bars the recovery of damages sustained within the limitations period but caused by pre-limitations period acts. In *Zenith,* the Supreme Court cited the general rule concerning when damages are recoverable under the federal antitrust laws:

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. ... In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. However, each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after the trial.

*Id.* at 338–39, 91 S.Ct. at 806 (citations omitted). The Court went on to delineate an exception to this general rule:

> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

*Id.* at 339, 91 S.Ct. at 806.

Zenith had been injured by defendant's participation in certain patent pools. Although Zenith limited its damage claims to those damages incurred during the limitations period (1959–1963), defendant claimed that at least some of those damages were caused by pre–1959 conduct and were time-barred. The Court applied its "speculative damages" exception and reasoned:

> We find it difficult to believe that Zenith could have convinced a District Court sitting in 1954 that, although it contemplated a free market from that time forward, it would still be suffering from provable injury more than five years later. It is true that the damages awarded Zenith in this case were based on estimates of its volume of business in a free market. But those estimates were for a past period of time; the size and conditions in the market were known and the competitive forces were identifiable. Zenith's performance during the same period and under comparable conditions was a matter of record. It is quite another matter to predict market conditions and the performance of one competitor in that market five to 10 years hence.

*Id.* at 341–42, 91 S.Ct. at 807–08.

Despite defendant's urging, I believe that neither *Zenith* nor its progeny announced a hard-and-fast rule that each item of damages must be traced to a specific overt act within the limitations period, especially where, as here, plaintiffs' injuries are due to the operation of a continuing conspiracy with continuing effects. As the Supreme Court stated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968):

> We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm. ...

*Id.* at 502 n. 15, 88 S.Ct. at 2236 n. 15 (citations omitted). It cannot fairly be said that plaintiffs' damages resulted solely from pre-limitations period acts; furthermore, it would be extremely difficult, if not impossible, to determine which particular act caused which discrete amount of damage. I am not inclined to place this burden

upon plaintiffs, nor do I believe that the remedial purposes of the statute would be served by such a construction.

Nevertheless, even if *Zenith* does stand for the proposition that all damages must be traceable to an overt act occurring within the limitations period, application of *Zenith*'s "speculative damages" exception would be appropriate. The B & LE argues that plaintiffs' damages do not fall within the *Zenith* exception for two reasons: (1) estoppel due to my dismissal of the pre-October 29, 1978 claims against the Penn Central, which involved a determination that claims were "ascertainable" prior to the consummation of the bankruptcy; and (2) the damages were not so speculative as to bar a cause of action before the limitations period. I note, however, that plaintiffs' claims against the B & LE were not at issue in *In re Penn Central Transportation Co.*, 771 F.2d 762 (3d Cir.), *cert. denied sub nom. Pinney Dock & Transport Co. v. Penn Central Corp.*, 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 576 (1985), and furthermore that "ascertainability" for bankruptcy purposes is not a synonym for "recoverability" under the antitrust laws.

The Third Circuit Court of Appeals has applied the *Zenith* exception to permit the recovery of damages caused (at least in part) by pre-limitations period acts. In *Harold Friedman Inc. v. Thorofare Markets Inc.*, 587 F.2d 127, 138–39 (3d Cir.1978), plaintiff was permitted to recover damages that it could not have estimated earlier. The court held that even if the district court had been correct in finding that plaintiff, who was forced to relocate his grocery store, had been injured in 1971, his 1974 suit was not time barred. Citing *Landon v. Twentieth–Century Fox Film Corp.*, 384 F.Supp. 450, 458 (S.D.N.Y.1974) ("The

fact that the parties to [copyright assignment] agreements are able to place some ascertainable present value on an expectancy interest in the renewal copyright to come into being twenty-eight years later is strong evidence that future damages flowing from an illegal tying arrangement involving the renewal rights can be calculated with reasonable certainty at the time of the original assignment."), the court concluded:

> [T]he type of guidelines present in *Landon* did not exist in 1971 for estimating Friedman's damages. Friedman seeks to recoup lost profits that resulted from its relocation—damages that could not be anticipated in 1971.

*Harold Friedman*, 587 F.2d at 139. The court explicitly adopted the Fifth Circuit's rule, announced in *Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029 (5th Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977), that damages resulting from anticompetitive conduct within the limitations period, but authorized by a contract entered into before the limitations period had begun to run, are recoverable.[1]

In *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pennsylvania*, 815 F.2d 270, 278 (3d Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987), Blue Shield alleged that organized dentists committed an antitrust violation by convincing Pennsylvania dentists to refuse to contract with Blue Shield. Many of the group's resolutions had been adopted prior to the limitations period, and many dentists' withdrawals from participation in Blue Shield's plan took place before that time. Citing *Zenith*, the court reversed the district court's grant of summary judgment in favor of the dentists and stated that

---

1. The Fifth Circuit added two caveats, which the Third Circuit cited in a footnote. First, the action must be brought within four years of the injurious act if "the violation is final at its impact," such as "where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts." *Imperial Point*, 549 F.2d at 1035 (quoting *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117, 126–27 (5th Cir.1975), *cert. denied*,

423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)). Second, "a cause of action will not lie for damages that occur within the four years preceding suit, if those damages result *solely* from acts committed by the defendant outside the four-year period." *Id.* at 1037 (emphasis added). I note that neither caveat applies here. This is not a case in which defendant's violation was a final act nor can it be said that plaintiffs' damages arose solely from pre-limitations period acts.

Blue Shield's cause of action arose only when it suffered injury. The court held that the action was not time-barred, noting that there was sufficient evidence for a trier of fact to find that there was a continuing conspiracy, given that Blue Shield was still continuing to feel the effects of the conspiracy and because of evidence of overt acts occurring within the limitations period. This holding implies that the *Zenith* exception applies to a continuing conspiracy with lingering effects, especially where overt acts take place within the limitations period. Such is the case here.

Furthermore, plaintiffs could not have calculated their damages with any degree of certainty until those damages had actually been suffered. Plaintiffs were purchasers, and as such could not have quantified "overcharges" until they were overcharged:

> Plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future. ... Not until the monopolist actually sets an inflated price and its customers determine the amount of their purchases can a reasonable estimate be made. The purchaser's cause of action, therefore, accrues only on the date damages are "suffered"....

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).[2]

Finally, I note that given that the jury's finding of fraudulent concealment of the railroads' unlawful conspiracy, it would be inequitable to permit the B & LE to defeat the purpose of the antitrust laws by invoking the statute of limitations. Plaintiffs may recover all of their limitations period damages under the federal antitrust laws.

### B. *State–Law Claims*

██ An Ohio statute, commonly referred to as the Valentine Act, Ohio Revised Code § 1331.01 *et seq.*, proscribes anti-competitive conduct occurring within the State of Ohio, to the same effect as the Sherman Act. The statute expressly authorizes private suits by persons suffering injury as a result of violations of the statute and permits recovery of double damages. Ohio Revised Code § 1331.08. The statute further provides, in § 1331.12:

> "No statute of limitation shall prevent or be a bar to any suit or proceeding for any violations of §§ 1331.01 to 1331.14, inclusive...."

Thus, on its face, the statute plainly precludes the defense that any of plaintiffs' claims under the Valentine Act are time-barred. Plaintiffs have nevertheless not sought, in this action, to recover damages over the entire period of the alleged conspiracy; primarily as a matter of practical convenience, their claims under the Valentine Act have been limited to the period commencing January 1, 1968.

Defendant now argues, alternatively, that the Valentine Act is entirely preempted by the Sherman Act; that, at the very least, its "no limitations" feature is preempted by the Sherman Act; that the federal statute of limitations should be applied by analogy; and that, under a proper interpretation of Ohio law, Valentine Act claims are indeed governed by the general Ohio limitations statute, which provides a four-year limitations period, not tolled by fraudulent concealment. In essence, defendant argues that the "no limitations" provision in the Valentine Act does not mean what it says and, in any event, should not be applied in this case.

In my view, proper interpretation of the statute begins and ends with its plain language. This is a lawsuit brought pursuant to § 1331.08 and the "no limitations" provision in § 1331.12 applies to *"any suit* or proceeding for *any violations* of §§ 1331.01 to 1331.14, *inclusive."*

It may well be, as defendant has so laboriously attempted to show, that the original impetus for the "no limitations" provision was the recommendation of the Attorney

---

**2.** Indeed, had plaintiffs brought suit earlier defendant certainly would have argued that their future damages were unduly speculative.

General of Ohio, in 1910, that more time was needed for investigations leading to *quo warranto* or injunctive proceedings instituted by the Attorney General. But the statute was enacted by the Legislature, not the Attorney General; and the Legislature may well have concluded that anti-trust enforcement would be enhanced by extending the time for private enforcement actions as well. Given the plain language of the statute, it would be an exercise in judicial usurpation of the legislative prerogative for this court to accept defendant's policy and legislative-history arguments.

Defendant's preemption arguments are equally unavailing. In *California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), the Court identified four instances in which federal preemption of state antitrust laws occurs: (1) when Congress has explicitly so stated; (2) when Congress intended to fully occupy a given field; (3) when compliance with both federal and state law is impossible; and (4) when the state law would obstruct the accomplishment and execution of the full purposes and objectives of Congress.

Applying these criteria, there can be no preemption in this case. Congress has not provided for preemption, nor has it occupied the entire field of antitrust law. As the Court stated in *ARC America, supra,* "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies" (*id.* 109 S.Ct. at p. 1665). There can be no contention that compliance with both the Valentine Act and the federal antitrust laws is impossible, or that the statute as a whole, or its "no limitations" provision, in any way impedes fulfillment of a congressional objective.

In *Pinney Dock & Transportation Co. v. Penn Central Corp.*, 838 F.2d 1445 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988), the Sixth Circuit Court of Appeals reversed a district court ruling that the Clayton Act's limitations period preempted the Valentine Act's no-limitations provision. 838 F.2d at 1481. Finally, in *ARC America, supra,* the Supreme Court noted that there is a "presumption against finding preemption of

state law" in the antitrust field, 109 S.Ct. at 1665, and that the fact that a state law may provide for liability "over and above that authorized by federal law" is not a sufficient basis for preemption, *id.* at 1667.

I conclude, therefore, that plaintiffs' Valentine Act claims are not time-barred, and that neither the statute itself, nor its no-limitations provisions, are preempted by federal law.

## C. *Laches*

Rulings which were made before and during trial left open the possibility that, notwithstanding the "no-limitations" provision of the Valentine Act, some of plaintiffs' claims might be barred by laches. Also left unresolved was the related issue of whether laches was a matter for the jury, or for the court; that is, it was understood that, by submitting to the jury factual issues which might bear upon the laches defense, I had not finally ruled on the applicability of that defense, or its amenability to decision by judge or jury.

 I now conclude that laches does not bar any of the claims asserted in this litigation. In the first place, laches is an equitable defense, and has no application to actions at law for damages. *See, e.g., Smith v. Smith*, 168 Ohio St. 447, 156 N.E.2d 113, 119 (1959); *Wright v. Oliver*, 35 Ohio St.3d 10, 517 N.E.2d 883, 885 (1988). *See also Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832 (S.D.N.Y.1988 (laches inapplicable to antitrust damage actions because only applicable to equitable claims).

 Moreover, and perhaps of greater importance, the jury's factual findings rule out a laches defense. In answer to interrogatory No. 17, the liability jury found that the defendants acted affirmatively to conceal their conspiratorial activities; and in answer to interrogatory No. 18, found that, until October 14, 1977, none of the plaintiffs whose claims we are now considering had actual knowledge of the unlawful conspiracy, or knowledge of facts "which, through the exercise of due diligence,

should have caused them to discover the unlawful conspiracy".

These findings are binding and conclusive, if *laches* is an issue to be resolved by the jury. And, even if *laches* is a matter for the court to decide, these findings have an advisory effect which there is no reason to disregard. Moreover, in these circumstances, a judge should tailor factual findings to those rendered by the jury.

■ A further possible issue which has not been argued, except perhaps by implication, should also be addressed. Notwithstanding the absence of a limitations defense under Ohio law, it can be argued that a defendant's due-process rights might be violated by imposing liability to private litigants for damages occasioned by ancient wrongs. That is, there may be situations in which a fair hearing, in the constitutional sense, has been rendered impossible by the passage of time. Assuming there is some such due-process limit to the enforcement of the "no limitations" provision in the Valentine Act, I am satisfied that the circumstances of the present case do not give rise to any legitimate due-process concerns. Because of the nature of the business enterprises involved, the relevant events are well documented. Defendant has shown no significant prejudice attributable to delay.

For all of these reasons, I conclude that plaintiff's Valentine Act claims are not barred by *laches* or any other legal or equitable doctrine.

## VIII. TOLEDO WORLD TERMINAL, INC'S MOTION FOR JUDGMENT NOV OR A NEW TRIAL

■ The jury which tried the liability issues in this case found that the antitrust conspiracy, in which defendant Bessemer & Lake Erie (B & LE) was a participant, was a material cause of injury to the business of Toledo World Terminal, Inc. (Toledo); and that this injury resulted from

"acts in furtherance of the conspiracy, including the refusal to lease or sell dock properties or the refusal to lease or sell dock properties without restrictions, to prevent [the owners of Toledo] from en-

gaging in an iron ore business at Toledo, Ohio."

The jury which tried the damage issues was specifically instructed that

"in each case, it has been established that the particular plaintiffs but for this conspiracy would have been interested in and would have gotten into the business of handling pelletized iron ore." (Tr. 2124.) . . .

"The question is, when would they have gotten into that business? How much tonnage would they have handled? And what would have been their profit on tonnage that they would have handled?" (Tr. 2134.)"

Finally, the damage jury was instructed at length about the burden of proof, and that if, after carefully considering all of the evidence, they were of the view that the evidence did not measure up to that standard—*i.e.*, that it did not enable the jury to find that it was more likely than not that the plaintiffs had suffered damage in an amount which was reasonably ascertainable—they should award nominal damages. In the case of Toledo, the jury did award nominal damages, and Toledo now seeks judgment NOV in its favor.

According to plaintiff, the "uncontroverted evidence" leads inevitably to "one and only one conclusion", namely, that Toledo's actual damages were $4,246,000, which should be trebled to $12,738,000. Plaintiff's evidence, if accepted by the jury, would undoubtedly have produced a verdict in that amount. But plaintiff is incorrect in characterizing that evidence as "uncontroverted"; although defendant did not produce expert testimony of its own on the issues relating to Toledo, plaintiff's evidence was severely undermined through cross-examination, and to some extent by contemporaneous documents.

Plaintiff's theory was that, in the absence of the antitrust conspiracy, plaintiff would have handled all of the pelletized iron ore of Armco Steel. The parties had stipulated to the total tonnage of pelletized iron ore shipped to Armco during the relevant period and plaintiff's expert testified

to the amount of profit which Toledo would have netted by handling that tonnage.

But the expert's opinion, or assumption, that Toledo would have handled all of Armco's ore was patently far-fetched: there was documentary evidence from which the jury could have determined that the owners of what later became Toledo had never expressed any interest in establishing a dock to handle iron ore until 1979 (rather than the starting date assumed by their expert, 1973). Moreover, the persuasive force of Toledo's expert testimony was substantially neutralized by the expert's failure to consider whether, in the absence of the antitrust conspiracy, Toledo would have encountered competition from other docks—which might have at least shared in some of Armco's tonnage. Finally, the assumptions on which the expert calculated Toledo's hypothetical profits were subject to serious and legitimate challenge.

In short, the jury's rejection of plaintiff's damage evidence is not at all surprising; the verdict for nominal damages finds ample support in the record. Toledo's motion for judgment N.O.V. must be denied.

Toledo's alternative motion for a new trial fares no better. As noted above, it is my view that the jury's verdict was not against the weight of the evidence; and it was not contrary to the court's charge.

The liability jury had determined only that plaintiff was adversely affected by the antitrust conspiracy by being precluded from the dock business at Toledo. Obviously, it made no findings concerning the amount of plaintiff's losses, nor the duration of the period in which damages were sustained. It was therefore not misconduct for defense counsel to argue to the jury that contemporaneous documents established Toledo's lack of interest in handling iron ore in 1973 or for several years thereafter.

I also reject the contention that defense counsel in closing misled the jury by arguing that Armco's own business decisions during the relevant period showed that plaintiff would not likely have been handling pelletized iron ore for Armco; and by pointing out that accepting plaintiff's damage calculations would mean that Armco would have been damaged by the antitrust conspiracy to the tune of $36 million or more, yet Armco had not sued the defendant. The first part of this argument was entirely justified by the evidence, and was not misleading. Arguably, the statement that Armco had not brought suit, although true, went beyond the evidence. But plaintiff failed to preserve the error, if any, by an objection. New trials are not justified by belated seeking out of such minutiae; plaintiff is grasping at straws.

Finally, the argument that "the court erred in not ruling on plaintiff's motions requesting that the B & LE not be permitted to retry impact" is a puzzling one. Plaintiff did indeed file a motion in limine to preclude defendant from retrying issues already determined by the liability jury. Although no formal ruling on the record disposes of that motion, it is my recollection that, in discussions with counsel, it was agreed that plaintiff's position was correct, but that it could only be vindicated by evidentiary rulings in the course of the damage trial. More important, plaintiff does not, even now, contend that any of defendant's evidence was erroneously admitted—merely that defense counsel's closing argument improperly addressed issues of "impact" as well as the amount of damages. But (1) plaintiff failed to object at any time, and (2) it was entirely proper for defense counsel to argue that plaintiff's damage evidence should be rejected because, among other things, it overstated the duration of the alleged impact.

Plaintiff's alternative motion for a new trial will be denied.

## IX. PRE–JUDGMENT INTEREST

The juries' awards of damages under the federal antitrust laws are subject to trebling; it is clear that, in these circumstances, plaintiffs are not entitled to the addition of pre-judgment interest. But the plaintiffs who have been awarded damages under state law—the Ohio Valentine Act—contend that, under the law of Ohio, they are entitled to pre-judgment interest on the Valentine Act awards.

Section 1343.03(C) of the Ohio Revised Code, effective July 5, 1982, provides:

"C. Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good-faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good-faith effort to settle the case.

Ohio courts have held, however, that a party has not "failed to make a good-faith effort to settle" under that statute if the party has adequately cooperated in discovery proceedings, rationally evaluated risks and potential liabilities, and not interposed any unnecessary delay of the proceedings and has acted in good faith in settlement negotiations. *Kalain v. Smith,* 25 Ohio St.3d 157, 495 N.E.2d 572 (1986). The court specifically stated, however:

"If a party has a good-faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."

In the present case, it is true that the defendant B & LE made no settlement offers until after the liability verdict, and that the offer it made before the damage verdict was far less than either side had already expended in attorney's fees. Plaintiffs argue that the defendant could not have entertained a good-faith belief that its offers would be accepted, and that the defendant's settlement posture throughout the litigation does not measure up to the good-faith standard imposed by the Ohio statute. In the circumstances of this litigation, the defendant could well have entertained a good-faith and not unreasonable belief that it had no liability to the plaintiffs. Although the evidence of the overall conspiracy among the defendant railroads was compelling, most of that evidence related to the pre-limitations period, and very

little of it related to the defendant B & LE. There was a legitimate argument that, regardless of the improprieties which may have been committed by the other defendants, the B & LE was not guilty of anti-competitive conduct. There was also a legitimate contention that B & LE's participation in any alleged conspiracy had entirely ended before October 1, 1977. And it cannot reasonably be suggested that the defendant's appellate arsenal will be devoid of legitimate argument.

I recognize that, given the liability findings, I urged the parties to re-evaluate their settlement positions and come to a reasonable settlement of the case. At that point, all of the larger and most culpable defendants had settled, and it seemed appropriate to emphasize the practical implications of the fact that all of the plaintiffs' damages evidence would be focused upon the one remaining defendant. But I do not believe that the Ohio statute, properly interpreted and applied, requires a defendant to make a substantial offer to settle claims on which the defendant, not unreasonably, expects to prevail.

The motions for addition of pre-judgment interest will be denied.

## X. TREBLING OF NOMINAL DAMAGES

Several of the plaintiffs who were awarded only nominal damages as to some of their claims have filed motions to amend the judgment by trebling these nominal damage awards. I conclude, however, that trebling is appropriate only with respect to compensatory damages awarded by the jury—*i.e.,* where the burden of proof of actual damages has been met. The award of nominal damages signifies merely a decision by the jury that, as to the plaintiffs and categories in question, the evidence did not prove any actual damages. The nominal damage awards will not be trebled.

## XI. "OPPORTUNITY COST" DAMAGES

The Erie, Ambrosia, and Tauro plaintiffs sought to recover, in addition to claimed

lost profits, damages which they described as "opportunity costs" damages. Their economic experts testified, as I understand their testimony, that the defendant's conspiracy caused them to lose, not only the profits they would have earned handling or hauling pelletized iron ore, but also the additional economic benefits they could have reaped by investing those profits over the years. The jury rejected these additional claims, and these plaintiffs now seek judgment n.o.v. or a new trial on that issue.

Notwithstanding the terminology employed by the witnesses in describing these claims, I was not persuaded at trial, and I remain unpersuaded, of any meaningful distinction between such claims and a claim for pre-judgment interest. Although I agreed to submit the issues to the jury, primarily as a precautionary measure, I advised counsel at the time that, in my opinion, no such award could be permitted to stand. The jury verdict has now provided a further obstacle to such an award, and I see no basis for rejecting that determination.

## XII. SUFFICIENCY OF THE EVIDENCE OF DAMAGES

 The defendant earnestly contends that the evidence does not suffice to impose any liability upon the defendant, and that, in any event, there is inadequate evidentiary support for the jury's damage awards. I have discussed above my view that the evidence overwhelmingly established culpable, non-exempt, conduct on the part of the conspirators, and was adequate to prove the defendant B & LE's culpable involvement in, and non-withdrawal from, the conspiracy. Throughout both phases of the trial, the defendant vehemently argued, and sought to prove, that any damages actually sustained by the plaintiffs were attributable to economic factors other than the alleged conspiracy; that the economic studies upon which plaintiffs' damage claims were predicated were unreliable and erroneous; and that the damages claimed were either speculative, grossly exaggerated or non-existent. It is certainly true, in my view at least, that the evidence of damages did not so heavily preponderate in

favor of the plaintiffs as to render the jury's verdict a foregone conclusion. The evidence as a whole did not suffice to remove all reasonable questions concerning the timing and profitability of the changes in ore-transport the defendant's conspiracy allegedly delayed.

But these are all factual issues and were properly submitted to the jury. Viewing the record in the light favorable to the verdict, there can be no doubt that the evidence sufficed, in all respects, to support the jury's determinations.

## XIII. TRIAL ERRORS

Defendant's post-trial efforts have been devoted almost exclusively to obtaining judgment n.o.v. Of the many hundreds of pages of briefs submitted on behalf of the defendant, less than two pages deal with grounds for a new trial, in notably non-specific terms.

Assuming the defendant has not abandoned its quest for the alternative relief of a new trial, I am nevertheless not persuaded that there are valid grounds for that relief. So far as I am aware, no evidence was erroneously excluded or admitted, and the instructions to the jury were reasonably adequate and correct. If any errors did occur, I am satisfied they would have had no significant impact upon the outcome. Defendant's motion for a new trial will be denied.

## XIV. RAINEY PLAINTIFFS' MOTION FOR JUDGMENT NOV OR A NEW TRIAL

 The liability jury returned a verdict in favor of the defendant B & LE and against the Rainey plaintiffs, finding that these plaintiffs had not suffered injury as a result of the alleged conspiracy. The Rainey plaintiffs now seek judgment n.o.v. or a new trial.

The Rainey interests had operated a dock facility which handled limestone and gravel; their claim in this action is that they would have entered the field of handling palletized iron ore but for the defendants' conspiracy. But their business ceased op-

erations in 1959, and the jury could reasonably have concluded that their present claims represent convenient afterthoughts: There actually was little or no evidence to substantiate their bare assertions. There is no basis for post-trial relief in their case.

## XV. CONCLUSION

For the reasons discussed above, orders will be entered denying all post-trial motions except the defendant's motion for judgment n.o.v., which will be granted with respect to National Steel's investment-cost claims, and denied in all other respects.